IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 9, 2016 at Nashville


**ROSCOE GRAHAM v. STATE OF TENNESSEE**


**Appeal from the Criminal Court for Shelby County**
**No. 11-05371     Chris Craft, Judge**

_____


**No. W2015-01482-CCA-R3-PC  -  Filed March 2, 2016**

_____


In August 2013, Roscoe Graham ("the Petitioner") was convicted of aggravated sexual battery and sentenced to ten years' incarceration. Thereafter, he filed a petition for post-conviction relief, which was denied after a hearing. On appeal, the Petitioner contends that trial counsel rendered ineffective assistance by: (1) failing to assert a viable defense; (2) coercing the Petitioner to waive filing of a motion for new trial and direct appeal; and (3) operating under an actual conflict of interest. Upon review, we affirm the judgment of the post-conviction court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

Ryan C. Smith, Memphis, Tennessee, for the appellant, Roscoe Graham.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Melanie Cox, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

*Trial*

The Shelby County Grand Jury indicted the Petitioner for one count of aggravated sexual battery, a Class B felony, in August 2011. The facts at trial, as set out by the post-conviction court, were as follows:[1]

[O]n July 3rd, 2010, officers received a call-out to Le Bonheur[] Children's Hospital. There they spoke to the victim, a twelve year old female.

She stated she was at her father's home . . . and her two half-brothers were out of town with their mother. The victim stated that she and [the Petitioner] went to [an] On The Border restaurant to eat where he consumed alcohol.

Once they were home [the Petitioner] asked the victim, his daughter, if she trusted him and she said yes. The victim said [the Petitioner] then asked her if she'd ever had a massage. The victim said [the Petitioner] got some oil then told her to remove her clothing. He put an eye cover over her eyes and again asked if she trusted him.

The [Petitioner] was fully clothed before the lights were turned off. The [Petitioner] . . . then began touching the victim stating do you want me to stop. Telling her that she was wet, and kissing her, touching her . . . teeth with his tongue. The [Petitioner] touched the victim with his fingers inside her underwear on top of her vagina but did not penetrate her vagina. The victim stated the [Petitioner] was straddling her. The victim told the [Petitioner] that she wanted him to stop. He removed the eye cover and it was at that time the victim saw that the [Petitioner] had undressed.

The victim was then able to get away from [the Petitioner]. She called and told her mother that she wanted to go home. And her mother came to get her.

---

[1] Although the post-conviction court referenced the trial transcript in its order denying post-conviction relief, a copy of the transcript was not part of the record in this appeal.

Following a trial, a jury found the Petitioner guilty as charged. At a subsequent sentencing hearing, the trial court sentenced the Petitioner to ten years in the Department of Correction. That same day, the Petitioner waived his right to file a motion for new trial and to appeal his conviction. Consequently, the Petitioner did not file a direct appeal of his conviction and sentence to this court.

*Post-Conviction Proceedings*

On June 5, 2014, the Petitioner filed a timely pro se petition for post-conviction relief. Following the appointment of counsel, the Petitioner filed an amended petition. At a subsequent hearing, the Petitioner testified that he retained trial counsel following his indictment. The Petitioner explained that trial counsel had previously acted as corporate counsel for the Petitioner's private security business, EP Security, and that he had known trial counsel for ten years. The Petitioner stated that he met with trial counsel approximately three to four times at counsel's office and that those meetings lasted only ten to fifteen minutes. The Petitioner stated that he took his business partner, Mitchell Copeland, to his meetings with trial counsel because Mr. Copeland was his best friend. He stated that Mr. Copeland sat in on some of the meetings with counsel but that, at other times, he spoke to trial counsel alone. The Petitioner recalled that trial counsel reviewed discovery with him. However, according to the Petitioner, trial counsel never discussed trial strategy during their meetings. The Petitioner recalled trial counsel's saying that the State did not have any physical evidence against him, and counsel assured the Petitioner that "this would go away or at worst [the Petitioner] would get probation." Regarding the allegations against him, the Petitioner told trial counsel that it "never happened" and that the victim was lying. At trial counsel's urging, the Petitioner took a lie detector test, the results of which the Petitioner claimed were "inconclusive." Additionally, trial counsel had the Petitioner undergo a mental health evaluation with a psychiatrist. However, the Petitioner's mental health issues were limited to his claustrophobia, as well as anxiety arising from his criminal charges.

According to the Petitioner, trial counsel conveyed a settlement offer from the State, which would have resulted in the Petitioner's being sentenced to eight years at thirty percent. The Petitioner, however, rejected the State's offer. The Petitioner testified that trial counsel told him that the range of punishment was eight to twelve years at thirty percent but that he did not learn until "right before" trial that the offense of aggravated sexual battery carried a one hundred percent service rate.

The Petitioner testified that he requested that trial counsel interview two potential defense witnesses—the Petitioner's ex-wife and son—but that trial counsel failed to interview these witnesses. Regarding the proposed testimony from the Petitioner's ex-wife and son, the Petitioner agreed that it would have been limited to hearsay statements

- 3 -

and that neither witness was present the night the incident took place. The Petitioner stated that he discussed the possibility of testifying at trial with counsel. However, based upon the proof as presented, counsel advised that the Petitioner not testify, and the defense presented no proof at trial. The Petitioner stated that trial counsel failed to assert a viable defense strategy, commenting that "there was no strategy."

The Petitioner recalled that, at his sentencing hearing, he read a letter of apology to the victim. The Petitioner stated that trial counsel told him that it would "save two years off [his] sentence" if he wrote a letter of apology. The Petitioner claimed that he argued with trial counsel about writing the letter and that trial counsel angrily left the room several times when discussing the letter. Trial counsel then gave him a typed letter and told the Petitioner to copy the letter in his handwriting. In that letter, which was read by the Petitioner at sentencing and introduced as an exhibit, the Petitioner stated:

> Without going into details, a lot of things happened when I was growing up that I could not face when I became a man. The pain I went through I tried to ignore it and hide it. I didn't know how or who to talk to about this stuff in my head. I ended up hurting a lot of people that I love including my own child, and for that I was wrong. And for that I just want to say I'm so sorry for putting you through all of this.

The Petitioner maintained that he never admitted his guilt to trial counsel and that the words in the letter were trial counsel's.

Additionally, the Petitioner stated that trial counsel coerced him into waiving his motion for new trial and right to appeal at the sentencing hearing. He said that trial counsel advised him to sign an order waiving the motion for new trial and right to appeal in exchange for a ten-year sentence. The Petitioner recalled that, when he met with trial counsel before sentencing, counsel advised that the Petitioner would get the maximum sentence of twelve years. Counsel suggested that, if he wrote a letter of apology, the Petitioner could get two years taken off of his sentence. The Petitioner acknowledged that trial counsel's advice was based upon what trial counsel knew of the trial judge and his sentencing practices. The Petitioner recalled that he wrote two earlier versions of the apology letter but that trial counsel said "it wasn't enough." The Petitioner claimed that he and trial counsel argued about the letter and that trial counsel walked out of their meeting. When trial counsel returned, he had a typed letter, which trial counsel encouraged the Petitioner to copy. The Petitioner testified that he felt coerced to write and read the letter at sentencing because trial counsel said he would otherwise receive the maximum twelve-year sentence. The Petitioner acknowledged that, with the letter, trial counsel was able to negotiate with the State for a ten-year sentence. As part of the settlement with the State, the Petitioner also agreed not to file a motion for new trial and

to waive his right to an appeal. The Petitioner testified that the trial judge did not coerce him into entering into the agreement, and the Petitioner acknowledged that he made the decision to accept the ten-year sentence and give up his right to appeal as an act of his own free will.

Finally, the Petitioner asserted that trial counsel had a conflict of interest when representing the Petitioner. He explained that he learned after trial that Mr. Copeland, who owned fifty percent of the EP Security, had a close personal relationship with trial counsel that extended beyond their business relationship. The Petitioner suggested that both Mr. Copeland and trial counsel stood to benefit financially if the Petitioner was convicted and the business fell entirely into Mr. Copeland's hands. The Petitioner testified that Mr. Copeland ended up with "the whole business" and that Mr. Copeland closed EP Security and started a new company which took several contracts from EP Security. The Petitioner stated that Mr. Copeland benefitted from his incarceration and that he believed trial counsel also benefitted financially.

Mitchell Copeland testified that he had been good friends with the Petitioner for twenty years. Eventually, Mr. Copeland and the Petitioner started EP Security together, and they hired trial counsel to represent the company's legal interests. He stated that trial counsel had no financial interest in EP security but that trial counsel was paid from company funds to represent the Petitioner in the criminal case. Mr. Copeland recalled that, after the Petitioner's arrest, he made the Petitioner's $10,000 bond, putting up his house as collateral. He stated that he did not sit in on the Petitioner's meetings with trial counsel, although he did overhear trial counsel tell the Petitioner that the Petitioner would likely receive probation. Mr. Copeland acknowledged that he went to trial counsel's home for a Super Bowl party during the pendency of the Petitioner's case and that, after the Petitioner's sentencing, Mr. Copeland became the sole owner of EP Security. He explained that, while the Petitioner was in jail, he assured the Petitioner that he would put the Petitioner's share of the company into a bank account and hold it for him. However, once Mr. Copeland paid employees' salaries, there was no money left over. Mr. Copeland acknowledged that, since the conclusion of the Petitioner's case, he had started a new security business and that trial counsel represented him in that business. He stated that he had paid trial counsel $1,000 for work counsel had performed for his new business.

On cross-examination, Mr. Copeland stated that he accompanied the Petitioner to trial counsel's office "over twenty times" during the period between the Petitioner's indictment and trial. He explained that EP Security was dissolved as a corporation after the Petitioner's conviction and incarceration. He stated that trial counsel had not been an owner in EP Security and that trial counsel did not have an ownership interest in his new business.

Trial counsel testified that he had been practicing law for twelve years at the time he represented the Petitioner on his criminal charges and that he had prior experience handling trials, sentencing hearings, and appeals. According to trial counsel, he interviewed the Petitioner's son at the Petitioner's request. However, based upon his conversation with the Petitioner's son, trial counsel decided not to call him to testify for the defense. Trial counsel explained that the Petitioner's son's theory was that the victim made up the story about sexual abuse because she was upset that the Petitioner did not buy her an iPad. Trial counsel told the Petitioner that this explanation for the sexual abuse allegations was "ludicrous" and did not make sense, and trial counsel noted that both the Petitioner and the victim's mother could easily afford to buy the victim that item. Trial counsel denied that the Petitioner asked him to interview the Petitioner's ex-wife.

Trial counsel testified that the State made a settlement offer, in which the Petitioner would plead guilty in exchange for a ten-year sentence. Trial counsel, however, tried to negotiate for an offer of eight years. Trial counsel denied that he provided assurances to the Petitioner that the Petitioner would receive a sentence of probation. Trial counsel testified that he made multiple attempts to discuss a potential trial strategy with the Petitioner. Counsel recalled that the Petitioner did not have a defense other than "it didn't happen." Trial counsel tried to develop additional defense strategies with the Petitioner and attempted to force the Petitioner to "face what we were looking at." As part of his effort, trial counsel suggested that the Petitioner take a lie detector test. However, the Petitioner failed the lie detector test. Trial counsel then had the Petitioner submit to a mental evaluation at UT Medical Group. Trial counsel wanted to demonstrate to the State that the Petitioner sought treatment and was "addressing the problem." However, the State rejected these attempts and informed trial counsel that it intended to have the Petitioner serve a sentence of incarceration. Trial counsel testified that, based upon the circumstances, he argued to the jury for a conviction on a lesser-included offense at trial. Trial counsel acknowledged that he encouraged the Petitioner to write a letter of apology to the victim before the sentencing hearing. He further acknowledged that he eventually typed out a letter for the Petitioner to copy. He explained that the first draft was "creepy" in his opinion because it ended with "when I'm out we can continue our relationship" and that the Petitioner's second attempt was too "self-serving." Regarding his relationship with Mr. Copeland, trial counsel testified that, before the Petitioner's arrest, counsel had represented the Petitioner and Mr. Copeland in their security company business. Following the Petitioner's incarceration, trial counsel represented Mr. Copeland's new business in a labor law issue.

On cross-examination, trial counsel testified that he was retained to represent the Petitioner and that the charge was more serious than trial counsel initially anticipated. In the course of his representation, trial counsel met with the Petitioner about twenty-five

times at counsel's office and that Mr. Copeland often came with the Petitioner.  Trial counsel recalled that he had difficulty in getting the Petitioner to have open discussions about the victim's allegations.  The Petitioner maintained that the allegations were "some type of conspiracy" and that "he was the victim [in] some way."  The Petitioner also rejected the State's ten-year settlement offer.  Consequently, trial counsel arranged for the Petitioner to take a lie detector test.  Counsel testified that, if the Petitioner had passed the test, he wanted to use that in further negotiations with the State.  Additionally, trial counsel hoped that if the Petitioner failed the lie detector test, it would lead the Petitioner to communicate more openly with trial counsel so that trial counsel could better assist in a defense.  Unfortunately, when the Petitioner failed the test, it did not facilitate communication with trial counsel.  Trial counsel said that the Petitioner had a prior felony conviction for attempted voluntary manslaughter and that the State had provided notice of its intent to use this prior conviction against the Petitioner.  Additionally, trial counsel recalled that the court conducted a Rule 404(b) hearing prior to trial, in which the Petitioner's ex-wife's daughter testified about prior bad conduct involving the Petitioner.

Following the jury's guilty verdict, trial counsel told the Petitioner that they might be able to convince the court to accept a negotiated sentence for the same ten-year offer that he had prior to trial.  Trial counsel further told the Petitioner that, if the Petitioner wrote a letter of apology to the victim, it might convince the court to accept the deal.  Trial counsel acknowledged that he wrote the letter the Petitioner read at sentencing and stated that the Petitioner adopted the letter and rewrote it in his own handwriting.  Counsel recalled that the trial court agreed to the ten-year sentence after the Petitioner addressed the court and read the letter.  He denied forcing or coercing the Petitioner to write the letter, and he denied that he "stormed out" of the room when they were discussing the possibility of the Petitioner's writing a letter.  Trial counsel recalled that, as part of the agreement with the State, the Petitioner waived his motion for new trial and right to an appeal in exchange for the ten-year sentence.  Counsel stated that he discussed the waiver fully with the Petitioner  and that the trial court thoroughly questioned the Petitioner about the waiver before accepting the agreement.  Trial counsel testified that the Petitioner agreed to the terms of the agreement of his own free will.  Trial counsel maintained that his representation of both Mr. Copeland and the Petitioner, as general counsel of their business, did not impact his representation of the Petitioner in the criminal case.  Further, he denied that he had received any "monetary windfall" since the Petitioner's conviction.

Following the hearing, the post-conviction court denied relief in a written order filed July 6, 2015.  This timely appeal followed.

## II. Analysis

On appeal, the Petitioner contends that the trial court erred in denying his claim for post-conviction relief based upon ineffective assistance of counsel. Specifically, the Petitioner asserts that trial counsel rendered ineffective assistance by: (1) failing to assert a viable defense; (2) coercing the Petitioner to waive filing of a motion for new trial and direct appeal; and (3) operating under an actual conflict of interest. The State responds that the Petitioner has failed to establish that trial counsel's performance was deficient. We agree with the State.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."

Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

In cases involving allegations of a conflict of interest, this court will presume prejudice "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that an 'actual conflict of interest adversely affected his lawyer's performance.'" Strickland, 466 U.S. at 692 (quoting Cuyler v. Sullivan, 446 U.S. 335, 350 (1980)). However, if a petitioner does not raise an objection at trial he "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 348. Until a petitioner meets this burden, "he has not established the constitutional predicate for his claim of ineffective assistance." Id. at 350.

## A. Failed to Assert a Viable Defense

The Petitioner argues that trial counsel rendered ineffective assistance by failing to assert a viable defense. The Petitioner asserts that he and trial counsel met only briefly three to four times before trial, that counsel never discussed potential trial strategy with him, and that counsel offered no proof on his behalf at trial.

The post-conviction court found this allegation to be without merit, explaining:

> Both the [P]etitioner and [trial counsel] testified that [trial counsel] gave the [P]etitioner a lie detector test by an ex-FBI agent, which the [P]etitioner failed and then left on a trip to Las Vegas. [Trial counsel] stated that the [P]etitioner asked him to interview his son, but when he did, he found his story unbelievable ("ludicrous"). The son's theory was that the victim was framing the [P]etitioner because he would not get her an iPad. [The Petitioner's ex-wife's] daughter was an unindicted victim of the [P]etitioner, and her testimony would very likely have opened up the admissibility of that 404(b) evidence for impeachment purposes. [Trial counsel] made appointments for the [P]etitioner with a psychiatrist, hoping he could use his mental state (to convince the State to offer a lesser included guilty plea) but stopped the sessions after the first because there was nothing they could use. He met with the [P]etitioner over 20 times. The [P]etitioner admitted that they went over all of the discovery and met prior to trial to go over "who was who" on witnesses. The victim at trial was very intelligent, articulate and proved extremely credible. [Trial counsel] testified that his only theory was to convince the jury that it was something less than aggravated sexual battery. No other viable defense has been shown at the hearing on this petition.

In this case, the Petitioner has not established how trial counsel's defense strategy was deficient in light of the facts as presented to trial counsel at the time nor has the Petitioner suggested what other strategy trial counsel could have employed to reach a more favorable result. As previously noted, we will not second-guess a reasonable, yet ultimately unsuccessful, trial strategy. See Granderson, 197 S.W.3d at 790. Accordingly, the Petitioner has failed to prove deficient performance on the part of trial counsel or resulting prejudice, and he is not entitled to relief on this issue.

As part of his allegation that trial counsel failed to assert a viable defense, the Petitioner also contends that trial counsel "threw [him] under the bus" during closing argument when trial counsel conceded that the alleged conduct occurred. However, the record does not contain a transcript of trial counsel's closing argument, and the brief quote cited by the Petitioner in his brief is clearly incomplete and the meaning of the quote is unclear without further context. By failing to provide an adequate record for review, the Petitioner has waived our consideration of this portion of his claim. See Tenn. R. App. P. 24(b) (stating that the appellant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988) (concluding that "[w]here . . . the record is incomplete, and does not contain a

transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which a party relies, this [c]ourt is precluded from considering the issue[]"). Moreover, "[i]n the absence of an adequate record on appeal, we must presume that the trial court's ruling was supported by the evidence." State v. Bibbs, 806 S.W.2d 786, 790 (Tenn. Crim. App.1991).

## B. Coerced Waiver of Motion for New Trial and Appeal

The Petitioner contends that trial counsel rendered ineffective assistance when he coerced the Petitioner into waiving his motion for new trial and appeal. As proof of trial counsel's coercive behavior, the Petitioner asserts that trial counsel argued with him about the letter of apology, rejected the Petitioner's first two drafts of that letter, and forced the Petitioner to admit guilt in order to "save two [] years off his sentence."

Relative to this issue, the post-conviction court found:

> No credible proof of coercion was presented at the hearing on this petition. The [P]etitioner testified that [trial counsel] advised him to write a letter of apology in exchange for a 10 year sentence, and he followed that advice. He wrote his own letter at first . . . , but [trial counsel] stated that it was not good enough, and wrote one for him. [Trial counsel] stated that he rejected the first letter because it ended with "when I'm out we can continue our relationship" . . . , which was too "creepy" in his opinion. This court voir dired the [P]etitioner on his waiver after he read the letter from the witness stand . . . and finds there is no question that the [Petitioner] understood he was waiving his right to appeal, and that the waiver was freely and voluntarily made. This allegation fails for lack of any credible proof.

The record reflects that before the Petitioner's sentencing hearing trial counsel advised the Petitioner that he could reduce his likely sentence by two years if he read a letter of apology and waived filing a motion for new trial and an appeal. Trial counsel's advice to the Petitioner was based upon what counsel knew of the trial judge and his sentencing practices. Although trial counsel provided the Petitioner with a typed copy of the apology letter, the Petitioner adopted that letter as his own by writing it in his own handwriting and reading it at his sentencing hearing. Trial counsel denied forcing the Petitioner to write the letter, and he denied "storming out" of the room during discussions with the Petitioner about the letter. Trial counsel discussed the waiver of the motion for new trial and right to appeal fully with the Petitioner, and the Petitioner acknowledged that he made the decision to accept the ten-year sentence and give up his right to appeal as an act of his own free will. Further, the post-conviction court found that it questioned

- 11 -

the Petitioner regarding the agreement and that there was "no question" that the Petitioner understood he was waiving his right to appeal and that the waiver was freely and voluntarily made.

The evidence does not preponderate against the post-conviction court's determination that trial counsel did not coerce the Petitioner into waiving his motion for new trial and appeal. The Petitioner failed to show deficient performance and any prejudice from the alleged deficiency, and he is not entitled to relief on this basis.

### C. Conflict of Interest

Finally, the Petitioner asserts that trial counsel had a conflict of interest due to counsel's "substantial relationship" with Mr. Copeland, as well as trial counsel's business relationship with the Petitioner. The Petitioner argues that prejudice must be presumed in this case because trial counsel "was opportunistic and potentially benefitted financially" from the Petitioner's conviction and the subsequent dissolution of his partnership with Mr. Copeland.

In rejecting this claim, the post-conviction court found:

> The [P]etitioner was partners in a security business with [Mr.] Copeland, who testified as a witness at the hearing. [Trial counsel] was also the business's attorney. The [P]etitioner alleges a conspiracy theory wherein he surmises that [trial counsel] and Mr. Copeland conspired to convict him so that Mr. Copeland would get all of the [P]etitioner's business and [trial counsel] would somehow benefit. However, he also testified that Mr. Copeland was his best friend since childhood and he was closer to him than a brother. Mr. Copeland's testimony at the hearing did not support this conspiracy theory. He testified that he made the [P]etitioner's $10,000 bond, putting up his house as collateral, went with the [P]etitioner to [trial counsel's] office over 20 times, waiting in the lobby while they discussed the case, dissolved their security corporation after the conviction, and never made [trial counsel] a partner. After the conviction, he only paid [trial counsel] $1,000 to handle a labor dispute. This allegation fails for lack of any credible proof.

The post-conviction court also found "no conflict in this matter that would violate the rules of professional conduct" and concluded that the Petitioner had presented "[n]o evidence whatsoever . . . on which any conflict can be based."

Our review of the record shows that, although trial counsel represented the Petitioner's and Mr. Copeland's business interests in EP Security for ten years, counsel had no ownership interest in EP Security. Moreover, trial counsel received no money from the dissolution of the company because there was no money left over after Mr. Copeland paid the employees of EP Security. Although Mr. Copeland later started a new business, he testified that trial counsel had no ownership interest in this new business and that trial counsel had represented the new business in only a labor dispute, for which counsel was paid $1,000. The Petitioner failed to explain how trial counsel's representation of EP Security limited counsel's ability to represent the Petitioner in the criminal case. Moreover, there was no proof that trial counsel stood to benefit personally if the Petitioner was convicted or that trial counsel conspired with Mr. Copeland to take EP Security from the Petitioner. The Petitioner has failed to establish that an actual conflict of interest adversely affected trial counsel's performance. See Cuyler, 446 U.S. at 348. Accordingly, he is not entitled to relief on this claim.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE